UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| In re: | Case No. 23-31085-jda |
| | Chapter 11 |
| STAT Emergency Medical Services, Inc. | Hon. Joel D. Applebaum |
| Debtor. | |
| _____/ | |
| Charles M. Mouranie, Liquidating Trustee, | |
| Plaintiff, | |
| v. | Adv. P. No. 25-03014-jda |
| Constance Cheatem, | |
| Defendant. | |
| _____/ | |

**OPINION DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DISMISSING COMPLAINT**

This matter is before the Court on the motion of plaintiff, Charles M. Mouranie ("Plaintiff" or "Trustee"), Liquidating Trustee of STAT Emergency Medical Services, Inc. ("STAT"), for summary judgment (the "Motion"). (Dkt. 12). Plaintiff seeks judgment on a two-count Complaint to recover expenses allegedly incurred by STAT in training defendant to be a certified emergency medical technician. For the reasons set forth below, the Motion is DENIED and the Complaint is DISMISSED.

# I. Factual Background

On September 22, 2022, defendant, Constance Cheatem ("Defendant"), signed an agreement with STAT captioned: American Training Institute-STAT EMS EMT-B Scholarship Program Agreement (the "Agreement").[1] The opening paragraph of the Agreement explains its purpose:

> I, Constance Cheatham, am enrolled in the American Training Institute (ATI) EMT-Basic Academy and am electing to take advantage of STAT EMS' partnership with American Training Institute by enrolling in the EMT-Basic Course. The cost of the Tuition and Equipment, Supplies, Insurance, Education Support Services and Cost that STAT-EMS will loan me for educational advancement on my behalf is $5,500. I understand that I will receive the entire American Training Institute Course, post course support and training, including the Academy and any refresher and/or second class attempt if necessary (limitations apply), and all materials, uniforms and clinical support and education, field/job and educational support training as necessary to successfully retain sustained employment at STAT EMS and in the field of Emergency Medical Services, and all of this will be provided at ZERO charge to the aforementioned EMT Academy Cadet if I meet all of the requirements below.

The Agreement set forth the following specific requirements to be met by Defendant:

> Upon completion of the ATI course and after obtaining the Michigan EMT Basic license, I agree to work for STAT EMS for a period of 18 months following successfully completing the employment probationary period, at a status of Part-Time or Full-Time. (If I hire in at Full-Time I understand that I must remain Full-Time through the entirety of the contract, if I hire in as Part-Time, I may increase my status to Full-Time but may not lower my status).

---

[1] A copy of the Agreement is attached to the Motion for Summary Judgment. (Dkt. 12).

> If I drop out of or self-terminate the ATI EMT-Basic Course, by my choice, for any reason, I agree to pay STAT EMS the course tuition of $5500.00
>
> If I am dropped or terminated from the EMT-Basic Course, for any reason, by STAT EMS or ATI, I agree to pay STAT EMS the program tuition of $5500.00.
>
> I understand that I must schedule my first attempt to take the National Registry Exam within 2 weeks of being eligible to test. Further, if I do not successfully pass the National Registry written exam in three (3) attempts within the 8 weeks immediately following completion of the course, I agree to pay STAT EMS the course tuition of $5500.00.
>
> I understand that I must successfully complete all of STAT EMS' pre-employment requirements in order to be hired by STAT EMS, including, but not limited to; Background Check, Driver's License Check, Drug Test, Physical, Job Essentials Exam, checks with the State of Michigan, National Sex Offender Registries, and OIG Exclusions List. I understand that if I fail to successfully complete any of the above required pre-employment checks that I will not be hired by STAT EMS and I agree to pay STAT EMS the course tuition of $5500.00
>
> If my employment with STAT EMS is terminated, either voluntarily or involuntarily during the 120-day probationary period and/or the 15 month employment period, I agree to repay STAT EMS the course tuition of $5500.00.

The final paragraph of the Agreement states:

> In signing this form I agree to all of the Scholarship requirements and contents as outlined above and understand that if I leave the program for any reason, my employment with STAT EMS ends within the designated timeframe for any reason, or I do not become a licensed EMT-Basic within the designated timeframe, that I will be responsible for repaying the $5500.00 tuition fee back to STAT EMS. This amount will be invoiced to me or deducted, in full, from my final pay check, whichever is applicable based on my status with the company at the time . . . .

The Agreement was signed by Marc Lund, then CEO of STAT and Defendant, identified as "Emergency Medical Technician Academy Cadet."[2]

In her answer to the Complaint, Defendant asserts that she fully complied with the terms of the Agreement by finishing her training in November 2022, and timely passing the National Exam in December 2022. (Defendant's Answer to Complaint, Dkt. 4, filed *pro se*).

In December 2022, Defendant began working as a paid employee at STAT.

In her Answer, Defendant further states that, in February 2023, STAT stopped paying her for hours worked.[3] In March 2023[4], Defendant became aware of "the financial difficulties of [her] employer" and that she "would be losing [her] employment with this company indefinitely because they were being investigated for financial crimes and more." According to Defendant, she "honestly thought that [her] lapse in work with the company could remedy this and we continue on with our agreement. STAT EMS ceased all emergency services within that Month [sic]

---

[2] Along with the training contract, Defendant also signed a Non-Competition Agreement. The non-compete agreement has a duration of two years and covers a four-county area in Michigan (Genesee, Saginaw, Livingston, and Oakland counties). The Agreement also has provisions addressing non-solicitation of EMS customers and non-disclosure of proprietary information.

[3] Defendant's Answer states that STAT stopped paying her in February 2022. Given that the contract was signed in November 2022, the Court assumes that Defendant meant to say February, 2023.

[4] *See* footnote 3. Again, the Court assumes Defendant meant to say March 2023.

of March, 2023." According to Defendant, she did not resign, nor was she terminated from her job. Her employment ended in March 2023, when STAT shut down its EMT operations.

On July 5, 2023, STAT filed its voluntary chapter 11 (subchapter V) bankruptcy petition. On March 10, 2025, Plaintiff, formerly the Subchapter V Trustee and now the Liquidating Trustee under Debtor's Confirmed Chapter 11 Plan of Liquidation (Dkt. 171), filed the present two-count Complaint against Defendant. Count I, captioned "Open Account", alleges that "Debtor sold goods and services to the Defendant and incurred costs and expenses at the request of Defendant, on account, and upon the promise to pay for the same." (Complaint ¶ 8). The Complaint refers to an attached affidavit of Charles Mouranie which asserts an Open Account and Account Stated and "attest[s] to the balance and validity of the open account and account stated." The Complaint further alleges that a demand for payment was sent to Defendant by first class mail. Count I seeks to recover of $5,500 pursuant to section 542(b)(Turnover of Property to the Estate). Count II, captioned "Account Stated," alleges that "Debtor rendered its Statement of Account to the Defendant and the account has become stated." (Complaint ¶ 16). Because "Defendant has refused, failed and neglected to remit said sum to Trustee" (¶ 17), the Complaint seeks

5

25-03014-jda    Doc 17    Filed 08/19/25    Entered 08/19/25 11:10:26    Page 5 of 15

turnover of the funds as "a debt that is property of the estate and is matured, payable on demand or payable on order" pursuant to section 542.[5]

On April 7, 2025, Defendant filed her Answer to the Complaint. Defendant's Answer asserts that Debtor breached the contract by failing to pay her for hours worked in January and February 2023, as well as "committing financial crimes which lead to them being shut down by the State of Michigan" – meaning that she no longer "had the option to honor our agreement of employment for 12 months."

On May 14, 2025, the Court held an initial scheduling conference. (Dkt. 7). Defendant was given notice of the conference, but did not attend. The Court set a May 29, 2025 deadline for Plaintiff to file a motion for summary judgment. The Court also set a June 25, 2025 hearing date for the motion.

On May 29, 2025, Plaintiff filed the present Motion for Summary Judgment. (Dkt. 12). In the Motion, Plaintiff asserts that the facts are straightforward:

> The Debtor engaged in a contract on September 22, 2022, with Defendant, Constance Cheatem, in which the Debtor paid Defendant monies for tuition reimbursement wherein the Defendant was to be employed with the Debtor for a minimum of 18 months. Defendant's employment was terminated on February 20, 2023 causing a breach of contract.

---

[5] In addition to this adversary proceeding, Plaintiff has filed identical adversary complaints against 18 other former STAT employees. Those cases are hereinafter referred to as the "Associated Cases." Two of the Associated Cases were voluntarily dismissed. Defendants in the other 18 cases have defaulted.

6

25-03014-jda    Doc 17    Filed 08/19/25    Entered 08/19/25 11:10:26    Page 6 of 15

(Brief in Support of Plaintiff's Motion, Dkt. 12 at 2). As a result of the breach, and pursuant to § 542 of the Bankruptcy Code, the Trustee "is requesting funds be turned over to the estate pursuant to the Agreement []." *Id.* Defendant did not file a response to the Motion for Summary Judgment.

On June 25, 2025, the Court held the adjourned initial scheduling conference and heard oral argument on the Motion for Summary Judgment.[6] At the hearing, the Court raised what it viewed as a preliminary issue not addressed by Plaintiff, specifically: in light of *Sands Appliance Services, Inc. v. Wilson*, 463 Mich. 231 (2000), are the training expenses incurred by Plaintiff pursuant to the Agreement even recoverable under Michigan law? Because Plaintiff's Motion did not address that issue, the Court ordered supplemental briefing and adjourned the hearing.

On July 30, 2025, having considered Plaintiff's supplemental briefs (Dkts. 14, 15) and having heard oral argument, the Court took the matter under advisement. (Dkt. 16).

---

[6] Because Defendant did not attend the May 14, 2025 scheduling conference, the Court is unsure whether Defendant was aware of the Motion hearing date. However, because the Court is dismissing the Complaint, there is no prejudice to Defendant.

## Standard for Summary Judgment

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056 (Rule 56 applies in adversary proceedings). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. 317, 323. Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To demonstrate a genuine issue of material fact in dispute, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a "scintilla of evidence" is insufficient. *Liberty Lobby*, 477 U.S. at 252. The Court must believe the non-movant's evidence and

draw "all justifiable inferences" in the non-movant's favor. *Liberty Lobby*, 477 U.S. at 255.

"A court may enter summary judgment *sua sponte* in favor of a nonmoving party so long as the losing party was on notice to present all desired evidence on the matter at issue." *QSI Holdings, Inc. v. Alford*, 382 B.R. 731, 736 (Bankr. W.D. Mich. 2007), citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986) and *Salehpour v. Univ. of Tennessee*, 159 F.3d 199, 204 (6th Cir.1998). As Plaintiff's supplemental briefing requested by the Court attests, such is the case here.

## II. Analysis

Plaintiff asserts that the Agreement between STAT and Defendant is valid and enforceable under Michigan law.[7] Having reviewed the applicable Michigan law, the Court disagrees and finds that the Agreement is not enforceable against Defendant.

In *Sands Appliance Services, Inc. v. Wilson*, 463 Mich. 231 (2000), the Michigan Supreme Court held that employees cannot be required, as a condition of employment, to reimburse an employer for employer-mandated training. The

---

[7] At the hearing on the Motion for Summary Judgment, the Court questioned Plaintiff at great length as to why the Complaint did not allege breach of contract and whether the failure to do so deliberately or inadvertently would deprive Defendant of the opportunity to raise contractual defenses. These defenses are particularly relevant in light of Defendant's assertion that STAT stopped paying her, the sudden closing of STAT's EMS division, and STAT's bankruptcy filing shortly thereafter.

9

employee in that case was required to sign a "tuition contract" before he began employment. The contract required the employee, in exchange for job training, to pay the employer,

> the sum of $50.00 per week. . . and continuing each week for a period of three years, (a total of 156 weeks at $50.00 per week) at the end of the three year training period. It is agreed by Sands Appliance Service that each week of continued employment by Christopher Wilson will serve as payment for one week of the training period.

The contract went on to state that,

> at the end of six years total employment, (both as a trainee and as a graduate of training), this training shall be considered paid for in full. In the event of the termination of employment of Christopher Wilson for any reason, the tuition payments owed at that time are to be paid in full in U.S. Currency within a period of 7 days from the termination date.
>
> . . .
>
> However, at any time the employer may review the status of the employee and upon determination by the employer, in its sole and uncontrolled discretion [, that] the best interest of the employer would be served by a termination of this contract, then the employer may terminate this agreement upon written notice to the employee.

*Id.* at 243-44. In holding the contract unenforceable, the Michigan Supreme Court found that Michigan's Payment of Wages and Fringe Benefits Act ("WFBA"), MICH. COMP. LAWS § 408.478, was designed to "prevent kickbacks or payments of any kind to an employer in return for employment or its continuation." *Id.* at 247.[8]

---

[8] At the time the *Sands Appliance* case was decided, MICH. COMP. LAWS § 408.478, titled "Remuneration or consideration as a condition of employment prohibited," stated, in its entirety:

10

As applied to the facts of the case before it, the court found that "plaintiff required that defendant grant it a contractual right to financial recovery in the event he did not complete six years of employment. This repayment arrangement represents remuneration or consideration that ran from defendant to plaintiff" and violated the WFBA.

The key distinction made by the court with respect to tuition reimbursement programs is whether the education or training is *optional*. As explained by the court,

> We note, also, that some employers offer to fund employees' educations with the understanding that the employee will repay, unless they remain with the employer for a specific period. Such programs do not violate subsection 8(1) of the WFBA. As with reimbursement for personal phone calls and paying for employer-provided tools removed

---

(1) Except as otherwise provided in this subsection, an employer, agent or representative of an employer, or other person having authority from the employer to hire, employ, or direct the services of other persons in the employment of the employer shall not demand or receive, directly or indirectly, from an employee, a fee, gift, tip, gratuity, or other remuneration or consideration, as a condition of employment or continuation of employment. This subsection does not apply to fees collected by an employment agency licensed under the laws of this state.

(2) Except for a contribution required or expressly permitted by law or by a collective bargaining agreement, an employer shall not require an employee or a person seeking employment to contribute directly or indirectly to a charitable, social, or beneficial purpose as a condition of employment or continuation of employment.

11

> after a job ends, they are *optional* and not a condition of employment or continued employment.
>
> In contrast, the tuition contract was a condition of employment. Defendant could not work for plaintiff without submitting to its repayment provisions.

*Id.* at 248 (emphasis added).

Subsequent to *Sands Appliance*, the statute was amended. The amended statute provides, in relevant part:

> Sec. 8. (1) Except as otherwise provided in this subsection, an employer, agent or representative of an employer, or other person having authority from the employer to hire, employ, or direct the services of other persons in the employment of the employer shall not demand or receive, directly or indirectly from an employee, a fee, gift, tip, gratuity, or other remuneration or consideration, as a condition of employment or continuation of employment. This subsection does not apply to any of the following:
>
> . . .
>
> (c) Remuneration or consideration collected by an employer under an optional education repayment agreement in which the employer offers to fund an employee's education with the understanding that the employee will repay the costs incurred unless the employee remains with the employer for a specific period.

MICH. COMP. LAWS § 408.478 (2023).

The Court reads this amendment as codifying the holding of the *Sands Appliance* case: where an education expense is not optional, i.e. where the tuition expense is a condition of employment, an employer may not seek reimbursement of the expense from the employee.

12

The Agreement in this case is similar to the contract in the *Sands Appliance* case and does not fall within the exception set forth in the revised statute. The Agreement in the instant case makes completion of the training course and passage of the EMT certification test non-optional conditions of employment.

In Plaintiff's supplemental briefs, Plaintiff asserts that the training covered in the Agreement was not a condition of employment with STAT because Defendant was not required to obtain training at all. As explained in the affidavit of Stephen Lund, STAT's president:

> (1) The education reimbursement program and contract provided between Constance Cheatem and STAT Emergency Medical Services, Inc. was optional. Ms. Cheatem had the option of engaging in this education reimbursement program and remaining employed for 18 months as provided in the contract, and obtaining certain training which offered a higher rate of pay then [sic] she could receive other use [sic].
>
> (2) The contract and program was [sic] intended to provide potential employees with an opportunity to earn substantially more than they could have without this education.

(Supplemental Affidavit of Stephen M. Lund, President of STAT Emergency Medical Systems, Inc. attached to Supplemental Brief, Dkt. 15).

During additional oral argument on the Motion, Plaintiff's counsel recharacterized the point of the Lund affidavit. According to counsel, Mr. Lund did not mean to imply simply that Defendant had the option not to accept employment

13

with STAT. Rather, Mr. Lund meant that Defendant always had the option to obtain EMT training elsewhere.

Regardless of how the Lund affidavit is characterized, Plaintiff's argument misses the point. Of course, Defendant had the option to obtain and pay for EMT training elsewhere or elect to pursue a different career path entirely. But her EMT training and certification was required for *this* job with *this* company, and STAT deliberately chose to offer this mandatory training program in its effort to recruit new employees. The plain language of the Agreement conditions employment on successfully completing this training. In short, nothing in the Agreement can reasonably be construed to make completion of training optional for individuals hired as EMTs at STAT. The way in which the Lund affidavit and counsel's subsequent argument construes the Agreement is simply inconsistent with the *actual* terms of the Agreement.

Because the training covered by the Agreement was not optional but was a condition of employment, Plaintiff may not recover the cost of that training. While the Court recognizes there may be questions of fact surrounding when Defendant's employment with STAT ended, why it ended, and whether Defendant is owed unpaid wages, among others, none of those facts are relevant to the Court's holding that, *as a matter of Michigan law*, Plaintiff may not pursue from Defendant reimbursement of the tuition expenses allegedly incurred pursuant to the Agreement.

### III. Conclusion

For the forgoing reasons, Plaintiff's Motion for Summary Judgment is DENIED and the Complaint is DISMISSED.

**Signed on August 19, 2025**



/s/ Joel D. Applebaum
_____
Joel D. Applebaum
United States Bankruptcy Judge